This is Bergman v. Witek. DEPUTY ATTORNEY GENERAL RICHARD BRAIN Good morning, Your Honors. My name is Richard Brain, and I'm the Attorney General of the U.S. Department of Justice. And I'm here to respond in Warden Larry Witek. MR. WITEK Let me ask you a preliminary question that occurred to me. DEPUTY ATTORNEY GENERAL RICHARD BRAIN Certainly. MR. WITEK You proceed pretty much on the assumption that a lawyer's interest in getting paid conflicts with his client's interest. Now, I am not sure that that should be taken as a starting point. My thinking is when I present my credit card at the restaurant, it is very much in my interest that the restaurant feel confident that Visa will send them the money. When I go to my doctor's office and I give the receptionist my insurance card, it is very much in my interest that the insurance company will send the doctor his money. And for that matter, when I go to the store and pay by check, it's in my interest that the store be confident that my check will clear. And when I offer them cash, it's in my interest that they accept it and not tell me something like, oh, we can't break a $100 bill. So it is not necessarily in my interest to keep my money. It's in my interest that if I want something from somebody, goods or services, that they get my money. I want them to get my money so that they will be happy to provide me with the goods or services. Now, it struck me that Bergman is in somewhat that position with his lawyer. It's in his interest that his lawyer feel confident that he will get paid and that he get paid lots of money so that he will zealously represent Bergman. So I don't understand exactly why it is inherently a conflict of interest. And that's exactly our point, Your Honor. What we're advocating here is that the district court erred by granting relief on the grounds of attorney conflict of interest. And part of our argument is – I don't think you made that argument. No, we certainly did. Did I miss – I didn't – you did then. The warden's argument is, first, habeas relief is barred under Teague. And this case – this case originates from a conviction from 1981. Now, did you really argue that before the district court? Teague was asserted. It was in the return, but you – there's no briefing on it. It wasn't raised. It doesn't appear it was raised either before the magistrate or the district court judge. Didn't you waive it? And no, no, Teague wasn't waived. And I didn't think that – But you didn't argue it, right? And Teague was asserted. One line? One line assertion. So why didn't you argue it? Did you abandon it? No, Teague wasn't abandoned. But why, then, didn't you argue it before? I mean, it's – we're not supposed to review things that haven't at least been presented to the district court in the first instance. And as I read this record, you haven't done that. One line in that return is not going to fully argue the position that you're arguing in front of us or bring it properly and fairly to the district court's attention. And, Judge Wardlaw, that's why I cited the court to the Skokie v. Branch case, which is factually identical to this case. It's a U.S. Supreme Court case in which Teague was raised by a one-line assertion in the district court. It wasn't addressed by the district court. But why should there be a special rule for Teague as opposed to everything else with regard to how you present an argument? I mean, in this instance, Teague is a very technical argument. It requires you to tell the district court what the state of the law was at the relevant time, and you never did that. How are they supposed to do it? They were supposed to just figure it out themselves? And the answer to that is that Teague is a threshold question in habeas. Fine. But so are some other things. Procedural defaults can be waived. Other things can be waived. That's true, Your Honor. And the cases that have found waiver of Teague have been either never asserting it. Let me be clear about what I'm saying. Certainly. In ordinary circumstance, unless there's some special rule for Teague, would you agree that you did not adequately present the argument? That the district court could certainly say that this is not that you never made an argument. You made an assertion, but you never made an argument. And that's not good enough. And I would disagree with that, and disagreeing with that, Your Honor, under the authority of Gokey v. Frank. So you're saying there's a special rule for Teague. I asked you a question you didn't answer, which is, Teague aside, if this was any other assertion, would this be adequate? So what I'm trying to say is you seem to me to be telling me that there's a special rule for Teague, and why should that be as a procedural matter. I think in other contexts, yes, courts have found a waiver. That I'll agree with. But I'm not willing to concede that Teague is waived in this case because I'm relying on a Supreme Court case which has said under exactly the same circumstances And even if there's a local rule that says you have to do it this way, that Supreme Court case, because it's about Teague, overrules it? I believe so. We have a Supreme Court case that says under identical facts, even if Teague was asserted in a one-line assertion, as long as it's pursued and then briefed in the court of appeal, with all due respect, the Supreme Court held that the U.S. Court of Appeals erred by not considering the Teague argument. Why wouldn't you have a problem, even if you do get past the one-liner under that case, with our decision in U.S. v. Hearst? To the extent that United States v. Hearst, yes, it does announce that within the Ninth Circuit, Tyler v. Sullivan should apply to an allegation of attorney conflict of interest. That's true. But the question that we're asking under Teague is whether that particular decision mandates a grant of habeas relief, and in whether, you know, the test for under Teague is whether reasonable jurists could differ. If reasonable jurists can differ on a point, then that particular point of law is not clearly established. And that's why we are citing to this Court the U.S. Supreme Court decision in which the U.S. Supreme Court is saying they've never decided this issue. And in the case of Hearst, there's another argument that you don't quite discuss. But in Hearst, was the trial, was the lawyer with the economic conflict the trial lawyer? Correct. All right. Here, this person was not the trial lawyer. This individual did not take the case. The trial was fired before trial. So in terms of what the prejudice was, we know exactly what the prejudice was. We know the most the prejudice could have been, which is the introduction of this conviction, this confession. Nothing else, because he wasn't there at the trial. Correct. And so isn't that quite different? I'm sorry? Isn't that quite different from a Kyler situation where the whole problem is you don't really know how this is affecting the trial? We know exactly how it affected the trial. Well, absolutely. And that's why the entire rationale that the U.S. Supreme Court is articulating in saying that these, the Kyler v. Sullivan rules don't extend to conflicts other than conflict of representation. Well, no. I'm saying something else. If it was an economic conflict by a lawyer who did the trial, we might not be able to, we might have the same problem that we do in, under Hearst, we would have the same problem as we do with multiple representation or anything else. But this lawyer didn't do the trial. And I wonder what the significance of that is. My understanding is how the district court, for example, viewed Kyler v. Sullivan was any conflict in the attorney, automatic reversal. And I think that everyone along the way just assumed that. There's never, as far as I know, there's not a case which parses out at what point in the trial. I think the cases say an actual as opposed to a potential conflict. Well, correct. And if you'd like me to move on to the merits, I can do that. Let me ask you a couple of other questions. Certainly, Your Honor. You mentioned that the lawyer was fired. I don't know if I saw every page in the excerpts, if I missed this, but the way I read them, they were perfectly consistent with the lawyer ethically withdrawing and obtaining substitute counsel or getting his client to obtain substitute counsel because he knew he was going to have to be a witness. I can't tell which it was. Do we know whether the lawyer was fired or whether he just substituted out because it was necessary for him to be a witness? And I may have misspoke on that point. I did say fired, and I may have misspoke. All I know is that he was replaced. Okay. The next thing I want to ask you is, I know all the cops and prosecutors assume that the defense lawyer was a crook, as they often do. But I was wondering if we know from the record whether the lawyer lied to his client in order to get his fee and sacrificed the client's interest, or whether he truthfully advised the client and the client made an informed decision. Do we know whether it's one or the other? We do. And the answer is yes. How do we know, and what do we know? What we know is that Bergman was truthfully advised by his attorney, McGovern, that there was no deal in place. At all times, the conversations between these two was about the possibility of having these funds released. And the approach or the conversations that the attorney, McGovern, testifies to and that Bergman has also testified to in the record, go to, we're going to try and get you bail, and it's possible that your funds will be released. That was the understanding between, Bergman's understanding was that, yes, it was a possibility that he'd get the money, but also the client, Bergman, understood that he wasn't going to pay his attorney out of that $4,500 and some dollars. Well, it looked to me like there was quite a conflict on that. The lawyer thought that the $4,500 would go to his fee, and Bergman thought, assuming we don't know whether any of these people are telling the truth, but they testified in conflicting ways. The lawyer testified that the $4,500 was going to me. Bergman testified only $100 was going to the lawyer. The rest was for me. And it strikes me that that's a highly material difference of fact. And I did not read the record as McGovern saying all of the $4,500 was going to me. And most of you have the suggestion from his statements to the police saying, now how am I going to get the money, which is something he was trying to do. I don't believe he ever said I was going to get the entire $4,500. Let me ask you one perhaps last question. If we were to conclude that Kyler doesn't apply here for one reason or another, what is your position as to the status of the Strickland claim? Is there still a Strickland claim in this case? The Strickland claim has been abandoned by Mr. Bergman to the sense that he raised it in the habeas claim. And then I responded to that claim, and then he dropped it. He specifically told the Court he was dropping it. I briefed it. And I was prepared to argue it. We'd be talking about a lot of other, a lot of different things if that was the case. Well, I understand it's not the claim that's here now in appeal, but I'm wondering whether it was dropped or simply not reached because it wasn't necessary to reach it. No. My understanding was he affirmatively dropped it. If you look at his reply brief, he says we're dropping the claim. Does the Court have further questions? Has there been an evidentiary hearing in the district court to establish whether the lawyer lied to the client to get his fee or whether the lawyer truthfully advised the client and the client made an informed decision? There was not. That was my recollection. There was not. And it appears that all the parties felt that the record was adequate. It does need to be pointed out that the record that's before the Court was developed in the context of a suppression hearing regarding the voluntariness of Mr. Bergman's statements. It wasn't developed. It was contemporaneous with the events.  Correct. As I'm saying, I believe all the parties assumed that the issue could be resolved on the client's record. But no one requested an evidentiary hearing. Perhaps Mr. Bergman's counsel can address that. I believe he did. You believe he did request an evidentiary hearing. I believe he did. As I recall, also, the district court Judge Matz specifically articulated why he didn't feel an evidentiary hearing was necessary. I don't feel like I had an opportunity to answer all the Court's questions. Why don't you let Mr. Bergman's counsel argue, and then you can have some time to respond. If I could have a few minutes for rebuttal. We'll give you a minute or so for rebuttal. Thank you very much. Thank you, counsel. If you may, please, the Court. My name is William Genagli. I represent the Petitioner Appellee, Edwin Coe Bergman. In the case of the Supreme Court, the Teague claim was waived. There was a one-line assertion, one-sentence assertion, saying that we assert Teague v. Lang in the return. That wasn't adequate to alert anybody. Is it true that the Supreme Court has said a one-liner is enough? No, it's not, actually. The case that the State cited in their reply brief is Gove v. Branch, which is 514 U.S. 115. That is a case in which, in the appellate argument, the Eighth Circuit changed the nature of the Petitioner's claim from a procedural due process claim to a substantive due process claim. The State then made a full-fledged Teague argument, and the Supreme Court said under that circumstance it wasn't waived. Horne v. Benx, which is another case that I cite in my brief, says specifically when the State properly argues a Teague claim, then it's not waived. Let me ask you about something else. Sure. Let's assume that Teague is waived and we get to the merits. I have two questions or two problems that I want to have you address. One is the point that I raised with your adversary. It strikes me that a lawyer trying to get paid is not necessarily in conflict with his client's interest. It's in the client's interest that the lawyer get paid and get paid amply in order to reward his zealous attention to the case. So I don't understand why the lawyer trying to get the $4,500 or whatever it was is necessarily a conflict. There is nothing inherently conflicting about a lawyer's interest in wanting to get paid and a client's interest in paying the lawyer. What the conflict is here, Judge Honfeld, is that the lawyer negotiated a situation to get his money, whereas client got no benefit from it. I don't see that. Other than foreclosing defense. I don't see that. Let me tell you why so you can address my problem. Sure. What the lawyer told the client, as I understand it, was, and it's really not contested, is although we don't have a firm deal and it will ultimately be up to the judge, I feel fairly confident that if you cooperate with the cops on helping them find the body, then the prosecutor will not oppose bail and we will be able to get you out on bail. Now, helping to find the body might be bad for the trial. However, what occurred to me is this defendant, I remember he had a pool party at his house, a swimming pool, and he was able to host a fair amount of security. One thing that occurred to me is if he gets out on bail, there may not be a trial. He can jump bail. He can go to Mexico. He can go someplace without extradition. This guy's already a dope dealer and a murderer and a rapist. Should I think he has some strong moral objection to bail jumping? That's where he would draw the line? It seems to me all he has to do is get out on bail. And it doesn't matter if he's admitted that he's guilty of the crime. Once he's out on bail, we'll never see him again. That was exactly my take of the alternate scenario here, is that the bail was the most important thing to him, along with maybe some cash, because it was a flight risk. I don't know if the judge would have let him out on bail, but there was never an exact promise that he would. A person, we do these kind of determinations all the time. Are they a danger to the community or a flight risk? This person clearly falls in the category of flight risk. And that's why under State law I think he's ineligible for bail. And, in fact, what the prosecutor testified to, what Officer Wren testified to, and what Officer Collette testified to is that we told him he was not going to get bail. They never, the prosecution witnesses in the suppression hearing said, we never told him he was going to get bail. That's something the lawyer created. Let me read you this part of the transcript, because I'm having a hard time reconciling it with this characterization. Question. This is of Bergman. Could you say what page it is? This is of Mr. Bergman. I'm sorry, they're asking Mr. Bergman. Yes. This is of Mr. Bergman, page 77. I'm not sure if that's, it's volume one, page 77. You told counsel in direct that if it wasn't for the promise of bail or getting your money back that you wouldn't have made the statement, done the things and pointed out the things you did. Is that right? That's right. When you made that statement or did those things or engaged in that conduct that we're talking about here, you at no time believed they wouldn't use them against you, however did you? I don't think that was clear in my mind at all. I was thinking about bail. I was thinking about getting my money back. So those were his very interests. He wasn't at the point of, you know, incrimination. That's exactly right, Judge Wardwell. But the problem is, is that the conflict was something that the lawyer had and that the client's decision for going forward with depended upon the advice he was getting from his lawyer. The lawyer had an interest in getting the money. So what did he want it to do? He wanted Mr. Bergman to incriminate himself in return for really no benefit, because they Well, there is benefit if he gets out on bail and flees. It seems to me your argument depends on there being no bail possibility. And I think that if you look at the transcript, Judge Klinefeld, and look at the testimony of the district attorney, Mr. Ahedoff, and the testimony of the two detectives, they all say The detectives aren't really going to be the people who tell the judge what their recommendation is. It's going to be the DA. And I didn't – I don't recall him saying that. Tell me what page. I don't have the – I don't have the record site because it was never raised in issue before at any point in the case. There was never any question that the issue that motivated the lawyer to advise his client to go ahead and make this incriminating statement What we're interested in really is what motivated the client. And the client just told us in what Judge Wardlaw directed your attention to, wanted his money and he wanted bail, and he wasn't even thinking about the trial. The question It's interesting that he wasn't. That's exactly right, Judge Klinefeld. But the question is whether or not that was competent legal advice. If a lawyer gives a client A lawyer can't tell his client to jump bail. But if the client tells the lawyer, look, I'll do whatever they want as long as I can get out on bail. What I want is to get my money back and get out on bail, which is just what the guy said. It seems to me that you can't say that the lawyer is then unethical or ineffective or acting for his own interest and not the client's when he does exactly what the client wants. Let's be realistic here. I mean, this is a murder case. It was a robbery case. It was a rape case. It was a kidnapping case. And the guy is going to confess guilt to that kind of crime where someone is killed, and the lawyer thinks that the client is going to get bail. He didn't exactly confess guilt because his story, as I understand it, was that he did dispose of the body. And all he was doing was showing them where he disposed of the body. So he still had a story that he didn't kill the guy. He made many incriminating statements that linked him with the dead body. Whether or not he then believed his defense was another question, Judge Berzon. But the point is that you have to look at the reason the lawyer was giving this advice. First of all, you can't do that. Can I ask two questions before you stop? Sure. One is the question I asked before, which is, isn't this – is it clear that Kyler applies to the situation at all as opposed to Strickland, given the fact that this guy was not the trial lawyer? I don't think that it does. I don't think there's any case that's – that makes a distinction between pretrial and trial reconciliation. But a case like this in which we have a pretrial lawyer with an asserted conflict, we know exactly what the asserted prejudice was. You can find it from that, which is that this confession came in. Nothing else could have happened as a result of this lawyer. So why don't we just look at that and decide whether that's harmful or isn't harmful or prejudicial in a Strickland sense? Judge Berzon, when you take over the case with the client already having made those admissions, your hands are tied. There's not too much you can do. You can't negotiate a very good guilty plea. It has a lot of consequences. It sets your defense in stone. You don't have any room to negotiate. And that's what the problem here was. No one negotiates – Judge Kleinfeld knows this. When you're a defense attorney, you don't negotiate a deal where your client makes an incriminating statement for no benefit. I understand that you think there was benefit in the bail here, but that didn't – there was – they have a problem. I'm thinking – I'm thinking Bergman is no dope. He's not going to trial. If he's out, he's gone. And I just reviewed the prosecutor's testimony, and the prosecutor doesn't really say what you think he should have said. What the prosecutor says is, I don't recall, I don't remember. I don't recall such a statement being made. He's a marvel of forgetfulness. Well, there's certainly – I mean, I will look at the record, and I would like permission to submit a supplemental citation to the record, because I believe that is in there. But my point is that, getting back to your question – It is, and then he takes it back with this I don't recall formulation. Again, the question is not what motivated Mr. Bergman. The question is what motivated his lawyer to give him this advice and whether it was competent advice. I've got a question. Yes. Wasn't there evidence, and I don't have a particular citation to it, that, in fact, the sum of money that was being held had been impounded by the police had a lien on it, that the victim had imposed a lien so the lawyer wouldn't get it anyway? There was conflicting testimony about that. But what is not in dispute, really, is that Mr. McGrath, the lawyer, wanted that money for himself. He made that very clear, and he made it clear repeatedly. It was constantly his focus, and that's where his attention was. And I think if you look at Judge Max's opinion, he really gets it right, because what he says is that you don't let your client make incriminating statements in a murder case without getting some benefit for that. And there was no benefit for bail here because there was nothing on the table. You don't just – Well, that ain't necessarily so. I mean, sometimes clients just want to tell the truth, even though they don't get any benefit from it. And ultimately, it's their case. Judge Kleinfeld, the example you gave to the doctor before – let's say you go to a doctor. You've got an interest in the doctor giving you competent legal advice. This is a situation where if you want to compare it to a doctor, the doctor says, just take these pills so I'll get paid. It doesn't matter whether it's going to help you. In fact, it's going to harm you. I don't know. But let me get paid. I don't know about that. What the lawyer tells the client, according to the record, is if you cooperate, we have a good chance of getting bail, although I don't have an assurance. What the prosecutor says is I don't recall a discussion of bail. And what the client says is my mind was just on getting out on bail and getting my money back. And in that circumstance, a competent lawyer would not allow his client to make a statement that basically acknowledges his – It doesn't acknowledge his guilt. It just acknowledges that he knows where the body is. He met with them for an hour beforehand. He acknowledged where the body is if his roommate did it. He met with them an hour beforehand where he acknowledged his involvement in the death and then he took them to try to locate the body. That's incredibly incriminating evidence. Getting out on bail – Another strange fact here, however, is that the lawyer did not – McGovern did not get an agreement about what he cared about either. He didn't get an agreement about anything. In other words, if he cared about the money, he wasn't very good at that either. He just wasn't very good. He was – And, in fact, has been disbarred, which is also in the record. Counsel, you know, when we talk about whether the lawyer really locked it down, the most important agreements we usually see on the Federal side are cooperation agreements where the prosecutor recommends a downward departure. And, boy, those are just empty because they always leave it up to the prosecutor to decide whether the cooperation was good enough. First, the defendant comes in and spills his guts and snitches on all his friends, and then the prosecutor decides whether he's cooperated enough. It's always kind of one-sided that way and highly discretionary with the government. And if you look at Judge Mattis' opinion, what he points out is that in all of those agreements, there is an explicit provision against direct use. The prosecution cannot use that evidence when you go in for a proper agreement, which is the kind of agreement you're talking about. When you go in for a proper agreement, there's a provision that says, the State cannot use that against me. And nothing like that at all can be located there. Not necessarily so. When you go in for a cooperation, often the government can use the evidence and does. For example, they can require the defendant to testify against his co-conspirators. And then after the co-conspirators' trials are all over, the U.S. Attorney's Office decides whether the testimony was satisfactory. That's in a plea agreement, though. This wasn't a plea agreement. That's right. This is a – this was in the interest of a proper agreement. That's right. It's the analogy. The analogy is that the defendant bears all the burdens without having any ironclad assurance of any benefit. That's true. But that's a plea agreement where you've got nailed down what the offense is, what the charge is, what the offense level is. All that's nailed down in a plea agreement. This is like a proper agreement where you go in and say, my client wants to talk to you. I think he's got information that's going to help you solve this case. What will you do for him? The prosecutor says, we're not going to do anything for him. We're going to listen to him. There's also the fact that in the end it didn't help him solve the case because there was nobody. They certainly thought it was important enough to use his testimony against him as their first witness in their case in chief. And as I said before, that was the... It didn't help him solve the case. It might have helped him prosecute by the fact that he purported to know where the body was, but he didn't know where the body was. It didn't help him find the body, but I think it helped him secure a conviction. That's what I'm doubting. I guess he could have been playing games with him and maybe it didn't work. He could have been saying, I'll show you where the body is and you let me out on bail. And he thinks he'll get out on bail and flee. And if it doesn't work, then he'll go to trial and say, well, I pretended I could show him where the body was, but actually I had nothing to do with this murder. I have no idea where the body was. I was just playing him. And, you know, the fact that he didn't take that course and didn't succeed at it doesn't mean that that wasn't the plan. The point that I want to make, though, is you have to look at he hires a lawyer who he thinks is a competent person who's going to give him objective advice. The problem is, is that the lawyer's advice, this would all be fine if he got his money up front. I wouldn't have a claim. The problem is that Mr. McGovern's ability to give objective advice to someone who has retained him as a member of the bar is colored. And why is it colored? Because all he wants to do is get paid. He doesn't care if his client says where the body is. He doesn't care if his client goes in and talks to the police for an hour and they can use that against him. Anything in the record? I mean, it struck me also that $4,500, it wasn't a while ago, so maybe it was going to go far. But is there anything in the record about the $4,500 for any relationship to the actual likely bills? I think that Mr. McGovern was willing to take whatever money he could get to represent Mr. Bergman as evidenced by the But there was evidence about some possibility of a second mortgage on the house. That's possibly true. But when you have Mr. McGovern, I think there was reference to some 17 times or 15 times that he raised this subject with the police officers. And when they went out to Lake Mead to look for the body, look at the testimony of the officers and they come back. They said that's all McGovern could talk about was say, now I'm not going to get my money. Now I'm not going to get my money. That impressed me. Most police and prosecutors, in my experience, think defense lawyers are all a bunch of sleazes. And in this case, they were right, actually, because Mr. McGovern gave us very bad advice. Well, it's natural that a subsequent lawyer trying to win a case on conflict of interest would agree with the police. But I don't actually respect criminal defense lawyers very much, and I would not make claims that I thought were inappropriate. This lawyer, who's since been disbarred, which is in the record, sold his client out because he wanted to get $4,500. It's that simple. No lawyer, as Judge Mass says in his opinion, is going to let his client go in and make an incriminating statement with no agreement at all. And the advice that Mr. McGovern gave Mr. Bergman, sure, you can look at Mr. Bergman and say he's a murderer, he's a rapist, and he wanted to get out on bail, but a competent lawyer would have said, listen, you're not getting out on bail here. I mean, do you really think anybody was going to give him bail? I don't even think he was eligible under state law. The judge never would have given him bail. A competent lawyer would have said, listen, I want to get my money. I mean, there are cases, guidelines cases, where the person is Category 6, and I wonder, how come this person was out on the street to commit the crime that he's in front of the court on now? And what Category 6? Get out. I don't know why people get out sometimes, but they get out. Well, if you look at what an objective, competent lawyer would have told Mr. Bergman under these circumstances, when he's charged with a second degree, with a first degree murder, actually, and as I said, I think he was ineligible for bail under state law. If he wasn't, check that out. How would we do that, whether he was ineligible for bail? If he was ineligible for bail? If he's ineligible, then it becomes clear that the only one. I'm asking you, how would we know whether he's ineligible? Is there anything in the record? I think that there is something, and, again, this was something that was not raised before, and so I'm sorry that I don't have it right at my fingertips. But there's a reference to it, I think, in the State evidence we're hearing and I think in some of the earlier briefs. And I would like the permission to submit that as a supplement. Well, we'll decide if we want it from you. We'll give you an order to supplement the briefs if we decide it's necessary. One last question. I know you don't – you're not looking for this route, but did you waive a Strickland argument connected to the conflict or only a broader – a different one? No. I actually – what happened was that after they filed their return, I voluntarily dismissed the straight IAC claim. If I had known that they were going to make a full-fledged argument about Teague, I might have conducted my argument a little bit differently. So that's another instance in which I think the argument about Teague being waived is important. And one other thing I just wanted to make about the waiver argument, I know I haven't spent much time on that, but in my experience, the State always puts a one-sentence statement at the end of every return for every claim saying this would violate Teague. It's like a poison pill. They never argue it until they get to the merits. Counsel, you don't waive anything by not asserting it in an oral argument. Everything in your papers is preserved. Thank you. Thank you, Counsel. Are there no further questions? And just very briefly, Your Honors, I do want to direct your attention to excerpts of record, pages 103 and 119, in which the attorney, Mr. McGovern, says that it's always his practice first to try and get bail. That's what he does in every case. It's not something special he was trying to do here, was to work some kind of deal out. That was his practice. Whether it's a good practice or not, that's a different issue. But that's what he did. And then in excerpts of record 119, you have the acknowledgment from Mr. McGovern. He's saying, I knew there was no deal. So was bail an impossibility here? I think under the local rules now that's true. I'm not sure what the State was in 1981. It's pretty much you have an presumptive no bail, and then you have to overcome this burden of the presumption. So it was not barred is what you're saying? It's not completely barred. Obviously, you have people like Phil Spector have been released recently. Was it then barred, are you saying, or not? I'm not sure, Your Honor. My understanding of the current local rules is there's a presumption of no bail that can be overcome. And I just wanted to make one other quick point, and this was on, you know, still going to the idea of actual prejudice. Both Judge Matz and Mr. Bergman's counsel here are kind of working their way backwards. They're saying, well, this behavior by counsel was just so insane, he couldn't have been motivated by anything else. And that's not really what we're looking at here. We need to walk through, was there an actual conflict that adversely affected the representation? They're kind of going backwards. They're saying, well, this is terrible. And that would be a basis for a Strickland claim, but that's not what we need. We need to establish the actual conflict first. And, you know, finally, Judge Kleinfeld, you keep talking about the notion of, well, yes, in some circumstances like this, a client wanting to retain their own counsel and paying them would be a benefit to them. And assuming that this Court is going to apply Ninth Circuit precedent, I do think Bonin v. Calderon settles this issue, and it settles it in favor of the warden, but to the extent that it does discuss and you don't have the actual deal, you could always raise the idea that, oh, my attorney just wanted to get paid. And this Court has addressed that issue, and that's in Bonin v. Calderon at 59F3rd at 826, 827. It has been discussed. Does the Court have any further questions for me? Roberts. Thank you, counsel. Thank you. Fergman v. Wycheck is submitted. Inland mediation v. City of Pomona. This is going to be a long morning. We're going to take a ten-minute recess first.
judges: Kleinfeld, Wardlaw, Berzon